|  |  |  |
|---|---|---|
| PROTECT-A-CAR WASH SYSTEMS, INC. | * | |
| | * | |
| v. | * | Civil No. 16-cv-534-JFM |
| | * | |
| CAR WASH PARTNERS, INC., MCW INC., and JOHN L. LAI | * | |
| | * | |

\* \* \* \* \* \*

## MEMORANDUM

Plaintiff Protect-A-Car Wash Systems, Inc. ("Protect-A-Car") brings suit against

Defendants Car Wash Partners, Inc. ("CWP"), and CWP's CEO, John L. Lai ("Lai"). Protect-A-

Car alleges claims of: (1) trademark infringement under the Lanham Act; (2) unfair competition

under the Lanham Act; (3) cybersquatting in violation of the Anti-Cybersquatting Consumer

Protection Act; (4) cancellation of CWP's registration and application under the Lanham Act;

and (5) unfair competition under Maryland law. Now pending is Defendants' motion for

summary judgment [ECF No. 48], and Protect-A-Car's motion for partial summary judgment

[ECF No. 49]. The parties have fully briefed the motions, and no oral argument is necessary. *See*

Local Rule 105.6. For the reasons set forth below, Defendants' motion is granted, and Protect-

A-Car's motion is denied.

## BACKGROUND

The uncontested facts are as follows. Protect-A-Car Wash Systems, Inc. ("Protect-A-

Car" or "Plaintiff") is a corporation that was organized and incorporated under the laws of the

District of Columbia on January 12, 1960. [ECF No. 1, ¶ 4]. Protect-A-Car describes its

operations as a business "that has been professionally cleaning cars in the greater Washington

1

area since 1958." [ECF No. 48, at p. 6]. Protect-A-Car currently operates six car washes, and all six locations are currently located within 14 miles of Washington, D.C.[1] *Id.* Plaintiff maintains its principal place of business at 101 North Glebe Road, Arlington, Virginia, 22203. [ECF No. 1, ¶ 4]. Protect-A-Car has been aware of Defendants since approximately 1995, and Defendants explored a possible acquisition of Protect-A-Car in 2000. [ECF No. 48, at p. 8; ECF No. 52, at p. 5].

Defendant Car Wash Partners, Inc. ("CWP") is a corporation that was organized and incorporated under the laws of Delaware on January 16, 1996. [ECF No. 1, ¶ 5]. CWP maintains its principal place of business at 222 East Fifth Street, Tucson, Arizona, 85705. *Id.* CWP is the nation's largest car wash operator, with 212 car washes and 34 lube centers in 21 states. [ECF No. 48 at p. 4]. Defendant John L. Lai ("Lai") is a natural person who maintains his residence and domicile in Tuscon, Arizona. [ECF No. 1, ¶ 6]. Lai joined CWP in 2002, and was promoted to CEO in 2013. [ECF No. 48, at p. 5].

Plaintiff Protect-A-Car owns federal registrations for two marks: (1) the "MR WASH BRUSHLESS CAR WASH" mark (  ), acquired in 1987 and used continuously since the late 1960s, and (2) the "MR WASH" word mark, acquired in 2003. [ECF No. 49-1, at p. 4]. Both marks are used in connection with car wash services.

Defendant CWP, in comparison, has used "MISTER CAR WASH" in commerce for at least forty-six years. *Id.* at 4. Regarding federal trademark registration, however, CWP was denied by the U.S. Patent and Trademark Office ("USPTO") on CWP's first three attempts to

---

[1] Protect-A-Car clarifies in its briefing that it previously owned and operated car wash facilities more than 14 miles from Washington, D.C., including locations in Catonsville, Maryland, and Woodbridge, Virginia. [ECF No. 52, at p. 6]. The court finds these facts irrelevant; these locations are not currently in operation, and these locations are roughly 30 and 60 miles, respectively, from the nearest CWP locations.

register the "MISTER CAR WASH" design mark (  ), the "MISTER CAR WASH" word

mark, and the "MISTER CAR WASH FOR BUSY PEOPLE" word mark. [ECF No. 49-1, at p.

4]. These marks were denied by the USPTO for being too similar to CWP's marks.[2]  *Id.*  In May

2014, however, CWP was successful in obtaining a trademark for the "MISTER CAR WASH"

word mark after appealing a USPTO rejection. *Id.* at p. 5.  The stylized trademarks, as generally

used in business,[3] appear as follows:



Plaintiff Protect-A-Car's Logo

Defendant CWP's Logo

[ECF No. 48, at p. 7; ECF No. 49-1, p. 7-8].

Defendant CWP created the website www.mistercarwash.com in 1996 for use in

connection with its business. [ECF No. 48, at p. 5].  In January of 2015, CWP entered the

Maryland market for the first time, acquiring two car wash locations ("Maryland Locations") in

Severna Park and Annapolis. *Id.*  The Protect-A-Car car wash closest to either of the two CWP

Maryland Locations is over 28 miles away. *Id.* There are several third-party car washes between

these two locations as well.[4]  Furthermore, there are other car wash companies, both nationally

---

[2] In May 2000, CWP's counsel sent Protect-A-Car a proposal whereby Protect-A-Car would
consent to federal registrations being issued for CWP's marks in exchange for CWP's promise
not to use these marks in the Maryland, Virginia, and Washington D.C. region. [ECF No. 49-1,
at p. 5; *see also* ECF No. 49-2, Ex. 1].  This agreement was never signed. *Id.*
[3] Protect-A-Car argues that its logo is occasionally not accompanied by the "man in the car"
logo; this is discussed in further detail, *infra.*
[4] CWP suggests there are 12 car washes between these two locations. [ECF No. 48, at p. 6].
Protect-A-Car contests this. [ECF No. 52, at p. 6].  Regardless of the exact number, it is evident
that there are at least several car washes between these two locations.

and within the Washington D.C. metro area, with "MR." and "Wash" as part of their names.[5] *Id.* at 7. The vast majority of car wash customers do not frequent car washes that are beyond three miles from their homes, and the statistics diminish even more dramatically after 10 miles. [ECF No. 48-18 ¶ 16]. Despite this, Protect-A-Car has provided some evidence to suggest it has brand awareness and customers outside of this 10-mile radius. For example, there are registered members of Protect-A-Car's "Car Wash Club"—which was discontinued in 2004—that have zip codes in Anne Arundel County. [ECF No. 52, at p. 7]. Furthermore, there are online reviews of Protect-A-Car's services by individuals who identify their locations as being more than 10 miles from a Protect-A-Car car wash. *Id.*

Protect-A-Car washes over one million cars per year. [ECF No. 48, at p. 10]. Protect-A-Car alleges 22 instances of purported "actual confusion" by customers mixing up CWP and Protect-A-Car. *Id.* at 9. Only five instances of purported confusion occurred in Maryland. *Id.* at 10. Of these five instances, two involved an individual purportedly contacting Protect-A-Car in order to cancel a CWP "Unlimited Wash Club" plan.[6] *Id.* One instance is an email sent by Protect-A-Car's controller to himself, memorializing a conversation he had with a mistaken individual who believed she was working with Protect-A-Car. *Id.* Another instance occurred when a CWP customer was mistakenly given a Protect-A-Car location phone number when she called a CWP location to dispute her plan. *Id.* The final instance of Maryland "confusion" involves an email sent to Steven Harris, owner of Protect-A-Car, from a family friend, Barbara

---

[5] Protect-A-Car objects to CWP's extensive evidence supporting the existence of these other car washes on evidentiary grounds; these arguments have little merit. The evidence includes, among other things, admissions by Protect-A-Car's officers at deposition admitting to the existence of these car washes.

[6] In fact, of the total 22 instances, 18 involved someone purportedly contacting Protect-A-Car in order to cancel a CWP "Unlimited Wash Club" plan. [ECF No. 48, at p. 10].

Morrison.[7] *Id.* It was revealed at deposition that Barbara Morrison's email was sent after Steven Harris requested her to send it in order to "demonstrate that people are confused"[8] [ECF No. 52, at p. 11-12]. Steven Harris never mentioned anything to Barbara Harris about this lawsuit. *Id.* Lastly, Protect-A-Car alleges two additional instances of confusion involving third party suppliers or vendors sending invoices to Protect-A-Car that were apparently meant to go to CWP, or vice versa. *Id.*

On February 24, 2016, plaintiff Protect-A-Car filed its complaint against CWP and Mr. Lai. [ECF No. 1]. Plaintiff alleges claims of: (1) trademark infringement under Section 32(1)(a) of the Lanham Act, 15 U.S.C.§ 1114(1)(a); (2) unfair competition and false advertising under Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1); (3) cybersquatting in violation of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d); (4) cancellation of CWP's registration and application under Section 37 of the Lanham Act, 15 U.S.C. § 1119; and (5) unfair competition under Maryland law. Defendant John Lai filed a motion to dismiss for lack of personal jurisdiction, which was denied by this court on June 16, 2016. [ECF No. 31]. Defendants then filed this instant motion for summary judgment on all counts on February 10,

---

[7] The email reads:
Dear Steve:

I was so excited to read in The Capital-the Annapolis Newspaper-that you were opening up a car wash in Annapolis! Since my family and I have been taking our cars to you for so many years for the best car wash in the DC Metro area, I was really glad we could do business in my neck of the woods.

Needless to say, I was really disappointed to learn that it was not your business, Mr. Carwash, but a business that practically stole your good name by calling themselves Mister Carwash. I assumed all along it was you, and truth be told, I wish you were opening up in Annapolis. I miss the wonderful service I always received at Mr. Carwash.

I'm bummed that someone else is using your name, for sure. We will stay in touch, and if I'm ever in your neck of the woods, I will get my car washed at your place!
Take care, Barbara Morrison. [ECF No. 49-1, at p. 15].

[8] It should be noted, however, that Barbara Morrison initially reached out to Mr. Harris by text message. [ECF No. 52, at p. 11-12]. The email, however, was sent at Mr. Harris's request. *Id.*

2017. [ECF No. 48]. Protect-A-Car, in turn, also filed its motion for partial summary judgment on February 10, 2017. [ECF No. 49].

## STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A genuine issue of material fact exists where, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 247. The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). Indeed, the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express* Corp., 190 F.3d 624, 633 (4th Cir.1999). The court must "view the evidence in the light most favorable to . . . the nonmovant,

and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotations omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

## ANALYSIS

Plaintiff Protect-A-Car alleges claims of: (1) trademark infringement under Section 32(1)(a) of the Lanham Act, 15 U.S.C.§ 1114(1)(a); (2) unfair competition and false advertising under Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1); (3) cybersquatting in violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d); (4) cancellation of CWP's registration and application under Section 37 of the Lanham Act, 15 U.S.C. § 1119; and (5) unfair competition under Maryland law.  I analyze these claims in turn.

### I.      Trademark Infringement and Unfair Competition

"In order to prevail on claims of trademark infringement and unfair competition under the Lanham Act," plaintiff Protect-A-Car must show the court that 'it ha[d] a valid, protectable trademark" and that defendant CWP's "use of a colorable imitation of the trademark is likely to cause *confusion* among consumers." *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 170 (4th Cir. 2006) (citing *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.,* 43 F.3d 922, 930 (4th Cir. 1995)) (emphasis added).  "A likelihood of confusion exists if 'the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question.'" *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009) (quoting *CareFirst of Maryland, Inc. v. First Care, P.C.*, 434 F.3d 263, 267 (4th Cir.

2006)). In assessing whether such confusion exists, "we look to how the two parties actually use their marks in the marketplace to determine whether the defendant's use is likely to cause confusion." *Id.* (citing *CareFirst,* 434 F.3d at 267).

Fourth Circuit case law, which applies here,[9] instructs the court to examine nine factors when analyzing "likelihood of confusion":

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

*George,* 575 F.3d at 393; *see also Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir. 1984) (setting forth factors one through seven); *see also Sara Lee Corp. v. Kayser–Roth Corp.,* 81 F.3d 455, 463–64 (4th Cir. 1996) (identifying factors eight and nine). Evidence of actual confusion, however, is "often paramount" in the likelihood of confusion analysis. *George,* 575 F.3d at 393 (citing *Lyons P'ship, L.P. v. Morris Costumes, Inc.,* 243 F.3d 789, 804 (4th Cir. 2001)). I analyze these factors in turn.

### A. Strength of Protect-A-Car's mark

"Generally, the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark." *George,* 575 F.3d at 393. Two considerations apply:

---

[9] Protect-A-Car incorrectly argues that the Federal Circuit's case law should apply to its trademark infringement claim, urging the court to apply a standard set forth in *In re E.I. DuPont De Nemours & Co.,* 476 F.2d 1357 (C.C.P.A. 1973). Federal district courts, however, assess likelihood of confusion, and therefore trademark infringement, by analyzing the factors set forth by their respective appellate courts. *See, e.g., Synergistic Int'l, LLC v. Korman,* 470 F.3d 162, 170–71 (4th Cir. 2006) ("In assessing the likelihood of confusion issue, our Court has identified . . . factors that should be considered[.]"). The Federal Circuit's case law regarding cancellation may be applicable, but only once infringement is found according to Fourth Circuit precedent. *U.S. Search, LLC v. U.S. Search.com Inc.,* 300 F.3d 517, 523 (4th Cir. 2002) ("[B]efore a federal registration may be cancelled, the plaintiff must prevail in its infringement action.").

"(1) *a mark's conceptual strength*, meaning the relationship between the mark and the goods or services it is used for, and (2) *its commercial strength*, meaning the degree to which the mark is known by the consuming public." *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, 868 F. Supp. 2d 468, 485 (D. Md. 2012) (citing *George & Co.*, 575 F.3d at 393–95) (emphasis added).

Regarding the first consideration, "[a] mark's conceptual strength is determined in part by its placement into one of four categories of distinctiveness: (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful." *George*, 575 F.3d at 393–94. Defendants argue that Protect-A-Car's "MR WASH" and "Mr. Wash Car Wash" in connection with car wash services are "undoubtedly descriptive." [ECF no. 48, at p. 14]. Plaintiff Protect-A-Car contends that the marks are "suggestive" in nature. [ECF No. 49-1, at p. 33]. The importance of whether the marks are ultimately considered "descriptive" or "suggestive" is important; "descriptive" marks are considered to be weak and are not accorded protection without proof of second meaning, whereas "suggestive marks" are considered to be strong and "presumptively valid." *See Pizzeria Uno*, 747 F.2d at 1527.

Suggestive marks "do not describe a product's features but merely suggest[] them." *George*, 575 F.3d at 393 (citing *Retail Servs.*, 364 F.3d at 538). "In other words, the exercise of some imagination is required to associate a suggestive mark with the product. *Id.* (citing *Retail Servs.*, 364 F.3d at 538). "Examples of suggestive marks are "Coppertone®, Orange Crush®, and Playboy®." *Id.* citing (*Sara Lee*, 81 F.3d at 464). In contrast, descriptive marks "define a particular characteristic of the product in a way that does not require any exercise of the imagination." *Retail Servs.*, 364 F.3d at 538. "Examples of descriptive marks include 'After Tan post-tanning lotion' and '5 Minute glue.'" *George*, 575 F.3d at 394 (citing *Sara Lee*, 81 F.3d at 464). Ultimately, however, "[d]istinguishing between a suggestive mark and descriptive mark

can be difficult." *Id.* at 394. Furthermore, this court notes that "the distinction to be given the two terms is frequently 'made on an intuitive basis rather than as a result of a logical analysis susceptible of articulation.'" *Pizzeria Uno*, 747 F.2d at 1528.

The court first notes that the words "wash" and "car wash" are purely generic, and are therefore not entitled to any trademark protection. *See George*, 575 F.3d at 394. ("[A] generic mark is never entitled to trademark protection."). Next, the court acknowledges the difficulty of categorizing the word "Mr." or "Mister" as "descriptive" or "suggestive." On the one hand, defendants have offered evidence that there are numerous car washes, both across the country and within Plaintiff Protect-A-Car's territory, that use "MR" in connection with car wash services. For example, Steve Harris, owner of Plaintiff Protect-A-Car, admitted at deposition that he was aware of at least several other car washes—located closer in proximity than Defendant CWP's locations—that use "Mr." in their names, including: (1) Mr. Gee's Car Wash in Washington, D.C.; (2) Mr. Clean Car Wash in Waldorf, Maryland; and (3) Mr. Kleen Car Wash in Alexandria, Virginia.[10] [ECF No 48-9 184:23-187:25, Harris Dep.]. Indeed, "'the frequency of prior use of [a mark's text] in other marks, particularly in the same field of merchandise or service,' illustrates the mark's lack of conceptual strength." *CareFirst*, 434 F.3d at 270 (quoting *Pizzeria Uno*, 747 F.2d at 1530–31). On the other hand, "Mr." arguably requires "some degree of imagination" in order to "associate . . . the mark with" cleaning services. *George*, 575 F.3d at 393 (citing *Retail Servs.*, 364 F.3d at 538). Ultimately, the court finds even if the mark is somewhat "suggestive," it is not "in fact distinctive or strong in the mark in which [Plaintiff Protect-A-Car is] dealing." *See Bridges in Organizations, Inc. v. Bureau of Nat'l*

---

[10] Plaintiffs contend that defendants "misrepresented what Steve Harris" said during his deposition. However, this court has reviewed Steve Harris's deposition testimony and finds no "misrepresentation." Steve Harris was directly asked whether he was aware of these locations, and he answered in the affirmative. [ECF No 48-9 184:23-187:25, Harris Dep.].

*Affairs, Inc.*, No. CIV. B-91-23, 1991 WL 220807, at *8 (D. Md. June 24, 1991) (finding that plaintiffs mark, "even if suggestive, is not in fact distinctive or strong in the market in which they are dealing," because "the words 'Bridge,' 'Bridging,' and 'Bridges' are used throughout the cultural diversity field to indicate the development of connections between people and cultures, which is exactly how plaintiffs adopted the word for their business."). Accordingly, conceptual strength weights in Defendants' favor.

The strength of mark analysis, however, does not end here. Regarding the second consideration, commercial strength, the court looks to the marketplace and asks "if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." *CareFirst*, 434 F.3d at 269. The Fourth Circuit set forth six factors to consider:

> (1) the plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark.

*George*, 575 F.3d at 396 (quoting *Perini Corp. v. Perini Const., Inc.*, 915 F.2d 121, 125 (4th Cir. 1990)).

With regard to the first factor, Protect-A-Car has provided evidence that it spends approximately $250,000 per year on advertising. This seemingly cuts in favor of Protect-A-Car. However, in *CareFirst*, the Fourth Circuit found that CareFirst's logo was not commercially strong, despite "the $50 million it ha[d] spent on advertising in the mid-Atlantic region over the last decade," because "CareFirst's registered mark—'CareFirst'—always appear[ed] in public coupled with 'Blue Cross Blue Shield.'" *CareFirst*, 434 F.3d at 270. The court found that CareFirst's evidence of strength consisted primarily of materials that "pair[ed] the CareFirst mark with the Blue Cross Blue Shield language," and therefore the mark, "standing alone" did

11

not have "conceptual or commercial strength." *Id.* at 271. Here, CWP argues that the MR WASH mark is accompanied by the "man in the car logo," and therefore "relevant consumers only very rarely, if ever, encounter the MR WASH mark alone." [ECF No. 48, p. 17]. This, CWP contends, is evidence that MR WASH is not strong enough to stand on its own without the support afforded by the stylized logo. *Worsham Sprinkler Co., Inc. v. Wes Worsham Fire Protection, LLC*, 419 F. Supp. 2d 861, 875 (E.D. Va. 2006) (finding that where plaintiff's advertising for Worsham Sprinkler Co. was frequently accompanied by VSC name or logo, "the evidence of this mode of advertising [was] further proof that plaintiff's marks, standing alone, are not strong enough."). Protect-A-Car has, however, produced evidence of certain advertising materials that do not use this logo, demonstrating that the logo is not always present.[11] [ECF No. 52, Ex. 17, ¶¶ 5-8 & Ex. A]. Ultimately, the court finds this factor weights slightly in Defendants' favor.

The second factor, however, is more telling. No consumer studies were performed linking Protect-A-Car with CWP, and "[t]he absence of such [studies] is telling, as such evidence is 'generally thought to be the most direct and persuasive way of establishing secondary meaning.'" *George*, 575 F.3d at 396 (quoting *U.S. Search, LLC v. U.S. Search.com Inc.*, 300 F.3d 517, 526 n. 13 (4th Cir. 2002)). The remaining factors were not discussed in significant detail, although the court notes that Protect-A-Car has had success since 1996.

---

[11] Protect-A-Car argues that CWP "literally . . . fabricated testimony to support this assertion" that the "man in the car logo" accompanies the MR WASH mark. [ECF no. 52, p. 18]. The court finds no evidence of such "fabrication"; CWP's reliance on deposition testimony and cited exhibits was reasonable, despite Protect-A-Car's later evidence to the contrary showing that the logo does not *always* accompany the mark. Indeed, CWP based its statements on "30 pages of print advertisements, photographs of PAC's signage, business cards, and coupons, all bearing MR WASH in combination with the logo, *all produced by PAC*." [ECF No. 54, p. 7].

Ultimately, the court finds that, under the summary judgment standard, the conceptual strength inquiry weighs in Defendants' favor, and the commercial strength factor slightly favors Defendants as well. Accordingly, the strength of mark factor, overall, weighs in Defendants' favor.

### B. Similarity of the marks

Similarity of the parties' marks focuses on the "dominant portion" of each to determine "whether there exists a similarity in sight, sound, and meaning" that would "result in confusion." *George & Co.*, 575 F.3d at 396. "To determine whether two marks are similar, 'we must examine the allegedly infringing use in the context in which it is seen by the ordinary consumer.'" *CareFirst*, 434 F.3d at 271 (quoting *Anheuser-Busch, Inc. v. L. & L. Wings, Inc.*, 962 F.2d 316, 319 (4th Cir. 1992)). For example, in *CareFirst*, the court had to compare CareFirst's mark with First Care's mark. *Id.* There, the mere fact that "bare text of the two [marks was] similar," was not decisive; rather, the Fourth Circuit analyzed whether the "marks have different appearances in the marketplace." *Id.* There, the court found that the two marks had "very different appearances in the marketplace," especially when CareFirst was "almost always paired with the Blue Cross Blue Shield language," and "First Care present[ed] its mark plainly and without any graphics." *Id.* Furthermore, the court stressed that when a mark is weak, as was CareFirst's mark, a consumer is "more likely to focus on the differences between the two." *Id.*

Here, Protect-A-Car's marks and CWP's marks, as presented, do not look alike. Although the marks contain similar language, they do not contain the same words. The marks do not use similar colors or fonts. *See, e.g., Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 94 (4th Cir. 1997) (finding dissimilarity in part because "Petro Stopping's

service mark is displayed in green, white, and red-orange[, while] James River's mark utilizes red, blue, white, and sometimes gray."). Furthermore, although Protect-A-Car's mark is not always accompanied by the "man in the car logo," it generally is—further likening this case to *CareFirst*. Protect-A-Car's argument relies predominantly on audible similarities between the two marks, but it fails to sufficiently account for the aforementioned differences. Moreover, MR WASH and MISTER CAR WASH do have audible differences as well. Ultimately, the key is whether similarities would "result in confusion." *George & Co.*, 575 F.3d at 396. The court finds that there is no genuine dispute of material fact regarding this issue, and that the marks are dissimilar—especially given the weakness of the marks. *See supra* Section 1(A). Accordingly, this factor cuts in favor of Defendants.

### C. Similarity of the services and facilities

The third and fourth factors, in this context, are related. Regarding the third factor, "the goods in question need not be identical or in direct competition with each other." *George*, 575 F.3d at 397. Regarding the fourth factor, "[t]he relevant inquiry . . . is whether the goods are sold to the same class of consumers in the same context." *JFJ Toys, Inc. v. Sears Holdings Corp.*, No. CV PX-14-3527, 2017 WL 679219, at *17 (D. Md. Feb. 21, 2017). Here, both Protect-A-Car and CWP operate car wash locations and provide car wash services. These factors cut in favor of Protect-A-Car.

### D. Similarity of advertising used by the markholders

"In comparing advertising, we look at a variety of factors: the media used, the geographic areas in which advertising occurs, the appearance of the advertisements, and the content of the advertisements." *CareFirst*, 434 F.3d at 273; *see also Pizzeria Uno*, 747 F.2d at 1535. Protect-A-Car argues that there is similarity in advertising because both Protect-A-Car and CWP "rely

14

on word of mouth and their respective Internet websites." [ECF No. 52, p. 31]. The "word of mouth" advertising argument is unavailing, given the geographic distance between the two companies. *See, e.g., Pizzeria Uno*, 747 F.2d at 1535 (finding this factor to not be "of decisive importance," given the 'unlikelihood of geographic overlap in advertisements"). Protect-A-Car's argument that both companies rely on "Internet websites," is similarly unpersuasive. *See Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 637 (6th Cir. 2002) (finding "the availability of information about the parties' goods and services on the Internet" insufficient proof "that they use common marketing channels," in part because "a non-specific reference to Internet use is no more proof of a company's marketing channels than the fact that it is listed in the Yellow Pages of the telephone directory"). Moreover, the court notes Roger Pencek's Expert Report, which explains that advertising is not a critical factor in obtaining and retaining customers in the car wash industry. [ECF No. 48, Ex. 13, ¶¶ 17-19]. Ultimately, while the court finds this factor cuts in favor of Defendants CWP and Lai, it also largely disregards this factor. *See Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F. Supp. 2d 454, 461 (D. Md. 2002), *aff'd*, 91 F. App'x 880 (citing *Pizzeria Uno*, 747 F.2d at 1527) ("Not all of these factors are of equal relevance in every case").

### E. Defendant's intent

The defendant's intent can sometimes be a "major factor"; "[i]f there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation g*enerally attempts to make his signs, advertisements, etc., to resemble the other's so as deliberately to induce confusion.*" *Pizzeria Uno*, 747 F.2d at 1535 (emphasis added).

Protect-A-Car argues that CWP intended to create confusion because: (1) CWP was denied trademark status initially by the USPTO, and (2) CWP negotiated with Protect-A-Car in 2000 for it consent to CWP's registration of the MISTER CAR WASH mark. These arguments do not establish a genuine issue of material fact regarding the intent issue. Rather, the facts show that CWP's MISTER CAR WASH is a well-established national brand, and there is no evidence that CWP "attempt[ed] to make [CWP's] signs, advertisements, etc., to resemble [Protect-A-Car's] so as deliberately to induce confusion." *Pizzeria Uno*, 747 F.2d at 1535. Furthermore, CWP's expansion into Maryland does not appear to be a result of CWP's intent to capitalize on Protect-A-Car's mark. *See, e.g., Giant Brands, Inc. v. Giant Eagle, Inc.*, 228 F. Supp. 2d 646, 654 (D. Md. 2002) ("Based on the evidence, Giant Eagle's move into Maryland appears consistent with its recent pattern of growth, not a result of Giant Eagle's intent to capitalize on Giant's mark."). CWP has not changed its mark to look more like Protect-A-Car's mark, or done something else to "create confusion." Instead, not only is there no evidence of such actions, but CWP never changed the outside signage of the Maryland Locations, "which still bear the Maritime Auto Wash signs." [ECF No. 48, p. 31]. As CWP argues, had it "wished to lure in consumers with its allegedly confusing name," it would have changed the "Maritime Auto Wash" signs immediately. Overall, this factor cuts in Defendants CWP and Lai's favor.

### F. Actual confusion

"The seventh and most important factor is actual confusion." *George*, 575 F.3d at 398. Indeed, "evidence of actual confusion is 'often paramount' in the likelihood of confusion analysis." *Id.* at 393 (citing *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001)). If there are only a "small number of instances of actual confusion," these instances may be dismissed as "*de minimis.*" *Id.* at 398. Furthermore, the inquiry is contextual; the

evidence of actual confusion should be "placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence." *Id.* (quoting 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §23:14). For example, if there "is a very large volume of contacts or transactions which could give rise to confusion," and only "a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight." *Id.*

"Actual confusion can be demonstrated by both anecdotal and survey evidence." *Id.* at 393. As an initial matter, the court notes that Protect-A-Car has not presented any "survey evidence" of actual confusion. CWP suggests the lask of such evidence should "weigh[] against a finding of actual confusion." [ECF No. 48, p. 27]. The court will not, however, draw a negative inference against Protect-A-Car from the lack of such evidence; as Protect-A-Car clarifies, survey evidence is not "needed, required or introduced in the majority of cases." [ECF No. 52, p. 30 (citing MCCARTHY at § 32:195)]; *see also Tools USA & Equip. Co. v. Champ Frame Straightening Equip. Inc.*, 87 F.3d 654, 661 (4th Cir. 1996) ("Actual confusion can be demonstrated by survey evidence, but contrary to Champ's suggestion, survey evidence is not necessarily the best evidence of actual confusion and surveys are not required to prove likelihood of confusion.") (internal quotation marks omitted).

In the absence of survey evidence, Protect-A-Car must introduce evidence of actual confusion by anecdotal evidence. Here, Protect-A-Car has offered evidence of 22 instances of "actual confusion." Of these 22 instances, 18 involved an individual contacting Protect-A-Car— via phone or online—to cancel an "Unlimited Wash Club" plan. In these instances, Protect-A-Car later determined that the customer was not a Protect-A-Car customer, but rather a CWP customer. This "confusion" stems from the fact that CWP owns a federal trademark registration

for UNLIMITED WASH CLUB, and has used that term since 2004. Protect-A-Car, in comparison, started used "Unlimited Wash Club" in 2013, *nearly a decade after CWP had been using its trademarked UNLIMITED WASH CLUB.* Importantly, of these 18 instances, two instances occurred prior to CWP's acquisition of the Maryland Locations, demonstrating that, at minimum, CWP's entry into the Maryland market did initiate the "confusion."

Furthermore, of the 22 total instances of reported confusion, only five instances occurred in Maryland. This is relevant because Protect-A-Car's complaint seeks to hold CWP liable for trademark infringement "based on CWP's use of the Infringing Marks in Maryland, not elsewhere." [ECF No. 30, p. 10]. Of these five Maryland instances, two are instances of consumers mistakenly contacting Protect-A-Car to cancel an "Unlimited Wash Club," as discussed *supra.* One instance is an email sent by Protect-A-Car's controller to himself, memorializing a conversation he with a mistaken individual who believed she was working with Protect-A-Car. [ECF No. 48, p. 22-23]. Another instance occurred when a CWP customer was mistakenly given a Protect-A-Car phone number when she called a CWP location to dispute her plan. *Id.* at 23. The court agrees with Protect-A-Car that these instances are not hearsay and that they are relevant to the analysis. [*See* ECF No. 25-26 (citing McCarthy at § 23:15)].

The final instance of Maryland "confusion" involves an email sent to Steven Harris, owner of Protect-A-Car, from a family friend, Barbara Morrison. CWP argues this email should be disregarded because it was directed by Steven Harris. Indeed, Protect-A-Car's brief admits that even if the email was not sent in bad faith for litigation purposes, it was sent after Steven Harris *requested* Barbara Morrison to send it in order to "demonstrate that people are confused" [ECF No. 52, at p. 11-12]. Protect-A-Car counters that the lawsuit was not filed for a year after this email, so it likely was not sent for litigation purposes. The court makes no determination on

whether this email was sent in bad faith or not, and it also makes no credibility determinations; instead, the court merely notes that Barbara Morrison *was* able to determine that CWP was not Protect-A-Car, which weighs in CWP's favor. [ECF No. 48, p. 23 ("Needless to say, I was really disappointed to learn that it was not your business")].

CWP's first argument is that a majority of Protect-A-Car's 22 instances of "actual confusion" are largely irrelevant to the analysis. "[T]rademark infringement protects only against mistaken purchasing decisions and *not against confusion generally.*" *Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 324 (4th Cir. 2015) (quoting *Lang v. Ret. Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991)). Many of the proffered instances of confusion—such as customers mistakenly calling Protect-A-Car to cancel car wash programs—relate to "confusion generally," as opposed to confusion regarding "purchasing decisions." Protect-A-Car argues, however, that these incidents are relevant. It argues, relying on secondary sources and out-of-circuit caselaw, that "damage to reputation and goodwill" is as important as confusion regarding "purchasing decisions." Regardless, it is unclear what evidence Protect-A-Car has proffered regarding "damage to reputation and goodwill." Even assuming Protect-A-Car is correct, and these non-purchasing incidents are relevant to the "actual confusion" analysis, Protect-A-Car faces a larger issue.

Protect-A-Car washes over a million cars per year, and CWP is the nation's largest operator of car washes. Given the "large volume of contacts or transactions which could give rise to confusion," the limited instances of actual confusion suggest that they may be "dismissed as '*de minimis.*'" *George*, 575 F.3d at 393; *see also Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 95 (4th Cir. 1997) ("In light of its huge volume of commerce, Petro Stopping's meager evidence of actual confusion is at best *de minimis.*"); *CareFirst*, 434 F.3d at

268 (finding that 3 out of 130 respondents—or a "confusion rate of 2 percent"—was "hardly a sufficient showing of actual confusion").

Ultimately, the court finds that Protect-A-Car's proffered evidence of actual confusion is, at best, *de minimis*. "At worst, [Protect-A-Car's] failure to uncover more than a few instances of actual confusion creates a 'presumption against likelihood of confusion in the future.'" *Petro*, 130 F.3d at 95 (citing *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980)). This factor weighs in Defendants' favor.

### G. *Quality of services*

The eighth factor, quality of services, is not particularly relevant here. It is "most appropriate in situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 (4th Cir. 1996). The court still notes, however, that CWP's MISTER CAR WASH brand has "a stellar reputation in the car wash industry." [ECF No. 48, p. 31]. For example, even Steven Harris of Protect-A-Car commented to CWP's former CEO in 2013 that "your business is doing great." *Id.* Steven Harris also testified that he recently visited one of CWP's Maryland Locations, concluding the experience "was nice." *Id.* His son, Nathan Harris, a Protect-A-Car principal had a similar experience at a CWP car wash location. *Id.* Protect-A-Car does not argue otherwise. Accordingly, although this factor weighs in Defendants' favor, it does not significantly impact the court's analysis.

### H. *Sophistication on the consuming public*

The ninth and final factor is buyer sophistication. "Barring an unusual case, buyer sophistication will only be a key factor when the relevant market is not the public at-large." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 (4th Cir. 1996). Here, the relevant market is

the "public at-large"; as Protect-A-Car states, both companies "seek to serve any person who drives a car and needs to get it cleaned, regardless of age, income level, demographic characteristic, or type of car used." [ECF No. 49-1, p. 36]. Accordingly, this is not an "unusual case," and the court largely disregards this factor.

*     *     *

The court has considered the above nine factors under the summary judgment standard. In doing do, the court finds that a majority of the factors weigh in Defendants' favor. This includes factors that the court accords more weight to, such as "strength of mark" and "evidence of actual confusion." *See Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F. Supp. 2d 454, 461 (D. Md. 2002), *aff'd*, 91 F. App'x 880 (citing *Pizzeria Uno*, 747 F.2d at 1527) ("Not all of these factors are of equal relevance in every case"). Ultimately, the court finds that Protect-A-Car has failed to set forth sufficient evidence to establish genuine issue of material fact regarding "likelihood of confusion." Accordingly, because the factors weigh heavily in Defendants' favor, Defendants are entitled to summary judgment on Counts I, II, and V.[12]

## II. Anti-Cybersquatting Consumer Protection Act ("ACPA")

Count III alleges a violation of the ACPA. "The ACPA was enacted in 1999 in response to concerns over the proliferation of cybersquatting—the Internet version of a land grab." *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 267 (4th Cir. 2001). "Cybersquatting is the practice of registering 'well-known brand names as Internet domain names' in order to force the rightful owners of the marks 'to pay for the right to engage in electronic commerce under

---

[12] "The test for trademark infringement and unfair competition under state law is the same as the test under the Lanham Act." *Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F. Supp. 2d 454, 460 (D. Md. 2002), *aff'd*, 91 F. App'x 880 (4th Cir. 2004); *see also Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 422 (4th Cir.1998) (holding that likelihood of confusion is the basic test for both common law and federal trademark infringement).

their own brand name.'" *Id.* (quoting S. Rep. No. 106-140, at 5 (1999)). "The paradigmatic harm

that the ACPA was enacted to eradicate" is "the practice of cybersquatters registering several

hundred domain names in an effort to sell them to the legitimate owners of the mark."

*Lamparello v. Falwell*, 420 F.3d 309, 318 (4th Cir. 2005).

Under the ACPA, a person is liable to the owner of a protected mark for cybersquatting if

that person:

> (i) has a bad faith intent to profit from that mark . . . ; and
> (ii) registers, traffics in, or uses a domain name that:
>> (I) in the case of a mark that is distinctive . . ., is identical or confusingly
>> similar to that mark;
>> (II) in the case of a famous mark . . . , is identical or confusingly similar to
>> or dilutive of that mark.

*Id.* at 267–68 (quoting 15 U.S.C. § 1125(d)(1)(A)). Regarding the "bad faith" determination, the

statute provides nine factors to consider,[13] and it also includes a safe harbor provision stating that

---

[13] (B)(i) In determining whether a person has a bad faith intent . . . a court may consider factors
such as, but not limited to:
> (I) the trademark or other intellectual property rights of the person, if any, in the
> domain name;
> (II) the extent to which the domain name consists of the legal name of the person
> or a name that is otherwise commonly used to identify that person;
> (III) the person's prior use, if any, of the domain name in connection with the
> bona fide offering of any goods or services;
> (IV) the person's bona fide noncommercial or fair use of the mark in a site
> accessible under the domain name;
> (V) the person's intent to divert consumers from the mark owner's online location
> to a site . . . that could harm the goodwill represented by the mark, either for
> commercial gain or with the intent to tarnish or disparage the mark . . .;
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the
> mark owner or any third party for financial gain without having used . . . the
> domain name in the bona fide offering of any goods or services . . .;
> (VII) the person's provision of material and misleading false contact information
> when applying for the registration of the domain name . . . ;
> (VIII) the person's registration or acquisition of multiple domain names which the
> person knows are identical or confusingly similar to marks of others . . .; and
> (IX) the extent to which the mark incorporated in the person's domain name
> registration is or is not distinctive and famous . . . .

22

bad faith intent "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(i)–(ii).

Accordingly, in order to have a valid claim, Protect-A-Car must proffer evidence that CWP: (1) "had a bad faith intent to profit from using the [www.mistercarwash.com]" (the "Domain Name"), and (2) the Domain Name "is identical or confusingly similar to" a valid trademark owned by Protect-A-Car. *Lamparello v. Falwell*, 420 F.3d 309, 318 (4th Cir. 2005) (citing *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 367 (4th Cir. 2001)). Protect-A-Car has failed to do so. The undisputed facts establish that CWP did not act in bad faith in order to profit from Protect-A-Car's mark. CWP has continuously operated the Domain Name since 1996 for legitimate business purposes. Under the facts presented, CWP would, at minimum, be protected by the ACPA's safe harbor provision. 15 U.S.C. § 1125(d)(1)(B)(ii). Furthermore, an analysis of the nine factors provided in the statute would also counsel a result in Defendants' favor. 15 U.S.C. § 1125(d)(1)(B)(i). Accordingly, Defendants are entitled to summary judgment on the ACPA claim.

### III. Cancellation of CWP's registration and application under Section 37 of the Lanham Act, 15 U.S.C. § 1119.

Count IV alleges a claim for cancellation of CWP's registration and application under Section 37 of the Lanham Act, 15 U.S.C. § 1119. "The plain language of Section 37 states that cancellation is available in 'any action involving a registered mark.'" *Airs Aromatics, LLC v. Opinion Victoria's Secret Stores Brand Mgmt., Inc.*, 744 F.3d 595, 599 (9th Cir. 2014) (quoting 15 U.S.C. § 1119). Protect-A-Car argues that this statutory provision is an independent cause of

---

*Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 268 (4th Cir. 2001) (citing 15 U.S.C. § 1125(d)(1)(B)(i)).

action that authorizes this court to "cancel" CWP's trademarks. However, "each circuit to directly address this statutory language has held that it creates a *remedy* for trademark infringement rather than an *independent basis* for federal jurisdiction." *Id.* (internal citations and quotations omitted) (emphasis added); *see also Nike, Inc. v. Already, LLC*, 663 F.3d 89, 98 (2d Cir. 2011), *aff'd*, 568 U.S. 85 (2013) ("Section 1119 therefore creates a remedy for trademark infringement rather than an independent basis for federal jurisdiction."). Accordingly, because Defendants are entitled to summary judgment on the Trademark Infringement claim, *see supra* Section I, they are also entitled to summary judgment on this cancellation claim.

## CONCLUSION

For the aforementioned reasons, Defendants CWP and Lai are entitled to summary judgment on all of Plaintiff Protect-A-Car's claims. CWP's motion [ECF No. 48] is granted, and Protect-A-Car's motion [ECF No. 49] is denied. A separate order follows.

Date: _8 /15/17_

_____
J. Frederick Motz
United States District Judge